NATIONAL FOUNDATION, a corporation, Plaintiff,

v.

FIRST NATIONAL BANK OF CATAWBA COUNTY, N. C., a banking corporation; First Savings and Loan Association of Hickory, N. C., a North Carolina savings and loan association; Fidelity Federal Savings & Loan Association, Hickory, N. C., a Federal savings and loan association; Citizens Savings and Loan Association, Newton, N. C., a North Carolina savings and loan association; First Federal Savings and Loan Association of Catawba County, Conover, N. C., a Federal savings and loan association; A. Gaither Hahn, Mrs. J. T. Walton, Jr., Mrs. Mable Rowe, T. L. Cilley, L. C. Gifford, T. W. Saunders, and J. W. Warlick, individually and as representative of all persons claiming any right, title or interest in, or authority over, the property of the plaintiff by reason of membership in the former Catawba County chapter of the plaintiff, Defendants.

Civ. No. 1379.

United States District Court
W. D. North Carolina,
Statesville Division.
April 12, 1960.

Robinson, Jones & Hewson, Charlotte, N. C., for plaintiff.

Smith & Keener, Patrick, Harper & Dixon, Emmet C. Willis, David M. McComb, Hickory, N. C., Lefler and Gordon, R. W. Whitener, William J. Sherrod, Newton, N. C., for defendants.

WARLICK, District Judge.

In this action, plaintiff, The National Foundation, a corporation, seeks to recover from the defendants certain monies and property alleged to belong to it and

wrongfully withheld by the defendants, in a sum in excess of $40,000. It seeks additionally an injunction to compel the defendants to account for and pay over said monies and to desist from interfering with the plaintiff in the administration of its property in Catawba County.

Jurisdiction for the action comes from a diversity of citizenship and the amount sought to be recovered. Title 28 U.S.C. § 1332.

Plaintiff is a corporation organized under the laws of New York and is duly qualified to act in North Carolina, having an office in Charlotte in the Western District. On June 9, 1958, its corporate name was changed in keeping with its new responsibilities, from The National Foundation for Infantile Paralysis, Inc., to its present one, and such change in name was duly filed with the proper North Carolina authority, all prior to the institution of this action.

The various financial companies named as defendants and having funds on deposit are either banking institutions or savings and loan associations, all legally created, and existing, and each is doing business in Catawba County, North Carolina. The individual defendants are citizens of Catawba County and formerly were officers and trustees of the Catawba County Chapter of The National Foundation for Infantile Paralysis.

Plaintiff is a charitable organization which for many years has been engaged in collecting charitable contributions and disbursing the monies so collected throughout the whole of the United States for the care and treatment of persons stricken with poliomyelitis and for research into the cause, prevention and cure of such disease.

In 1941 certain interested citizens of Catawba County, seeking to aid persons so stricken and to assist by research into the cause of such disease, organized a voluntary group to aid in the treatment and rehabilitation of polio victims and on application made, were issued a Certificate of Recognition by plaintiff; and on being accepted became a chapter of the national organization, and designated as the Catawba County Chapter of the National Foundation for Infantile Paralysis and as such associated with the National Foundation for Infantile Paralysis.

At its organizational meeting those sponsoring the Catawba County Chapter agreed to operate in conformity with the Manual for Chapters previously adopted by the National Foundation and under which all local chapters were organized, and at such first meeting adopted, among other things, the following resolution:

"Resolved: That pursuant to the condition contained in the 'Authority to Organize a Chapter' granted by The National Foundation for Infantile Paralysis, Inc., this Chapter shall, and hereby does, agree with The National Foundation for Infantile Paralysis, Inc. to engage in infantile paralysis activities in conformity with the Manual for Chapters, and the policies, rules and regulations prescribed, and to be prescribed, by the Board of Trustees for the National Foundation for Infantile Paralysis, Inc."

The Manual for Chapters in effect throughout the whole of the period embraced in this controversy together with amendments added from time to time, contained, among other things, the following revelant provisions:

(a) Chapter III B(7) (b): "All funds and property given to, received by, or coming into the custody of any Chapter or Branch Chapter belong to and are trust funds and property of The National Foundation to be expended only for the purposes provided in its Certificate of Incorporation and only in accordance with the rules, regulations and policies prescribed by it from time to time."

(b) Chapter II A and B: "A. Origin and Authority. A Chapter receives its Certificate of Recognition from, and is an integral part of,.

and is subject at all times to all rules, regulations and policies of the National Foundation. B. Purposes. A Chapter is the local unit of the National Foundation, responsible for the local infantile paralysis activities of the National Foundation within the Chapter's territory."

(c) Chapter III A(6): "Withdrawal of Certificate of Recognition. If, in the opinion of the president of The National Foundation, a Chapter has violated, or is violating any provision of the Certificate of Incorporation, by-laws, or Manual for Chapters of The National Foundation, or any rule, regulation or policy of The National Foundation, or if, in his opinion, a Chapter has failed, or refused to follow, or is failing or refusing to follow any rule, regulation or policy of The National Foundation * * * he may withdraw the Certificate of Recognition of said Chapter by giving written or telegraphic notice to that effect to any officer of said Chapter, and setting forth in said notice the cause, or causes, for said withdrawal.

\* \* \* \* \*

"If the Chapter concerned is unwilling to accept the decision of the president of The National Foundation as final, and so notifies him in writing within seven days of receipt of notice of his action, it may, by petition signed by at least two-thirds of its members, appeal in writing to the Committee on Chapters of The National Foundation within fourteen days after the receipt of notice of said action by the president to have its Certificate of Recognition re-instated. * * *"

(d) Chapter III B(7). Chapter Funds. "(a) General. Each year the National Foundation determines what percentage of the money raised through its annual fund raising appeal will be left in the localities where raised for administration by chapters or branch chapters. Ex-

cept as otherwise provided on page 15 hereof under caption 'Bequests', and until otherwise determined by the National Foundation, 50% of all other funds or property given to, received by, or coming into the custody of a chapter or Branch Chapter, shall be retained by said Chapter or Branch Chapter and the remaining 50% shall be forwarded forthwith to the National Foundation.

"No Chapter or Branch Chapter shall accept any bequest, devise, gift, donation or payment of any funds or property to be used for any purpose other than the ones permitted under the provisions of this Manual, nor shall any Chapter or Branch Chapter accept, without the written consent of The National Foundation first obtained, any bequest, devise, gift, or payment of any funds or property, the use of which is confined solely to said Chapter or Branch Chapter."

A-7. "Whenever the Certificate of Recognition of a Chapter is surrendered or withdrawn, all of its funds and property, including its books, files, records and official Certificate of Recognition, shall be forthwith delivered to the National Foundation or a representative thereof designated by its President. * * *"

Plaintiff is so organized that National Headquarters and the Chapters throughout the country are all integral parts of one organization. They are in no sense separate entities. The Board of Trustees of plaintiff delegated to the Chapters the work of caring for infantile paralysis patients and it has further delegated to National Headquarters the duty of carrying on programs of research, education, the training of doctors, nurses and physical therapists in the modern method of treating polio and making epidemic aid advances to supplement the depleted treasuries of the local chapters in their efforts to meet patient care costs. And to allow each program to be carried out properly the

trustees determine from time to time the division of the monies received by way of gifts, between the Chapters and National Headquarters. For a number of years this division has been 50% to the National Headquarters and 50% to the Chapters.

Based on the above concept it would be impossible for one unit to *loan money* in a strict banking sense to another unit. However it is regarded right and proper for one unit to advance funds to another unit which may be in need of money to carry out the program entrusted to it through the basic policies of the National Foundation. On the other hand it would appear that National Headquarters, recognizing that the time may come when funds allotted to an individual Chapter would prove insufficient to provide proper care for the patients of that chapter, the Trustees have further provided that National Headquarters may advance to those Chapters sufficient funds to carry out the work entrusted to them.

National Headquarters has likewise proceeded on the theory as appears from the evidence, that when there is an infrequency of epidemics of infantile paralysis in any one area and all of the money allotted would not be needed, and in that particular condition those Chapters, if they have been previously advanced monies from National Headquarters, would obviously be expected to return some portion at least from its surplus funds. On the other hand National Headquarters would not expect any return of advances made to any Chapters so long as that Chapter needs all of its funds to carry on the program outlined for it. In this manner it has been the policy of National Headquarters of plaintiff to use all available funds and eliminate if possible the building up of a surplus. This being predicated on the idea that the donors of the funds held made their gifts to take care of the existing needs.

Prior to the organization of the Catawba County Chapter, and as early as 1938, plaintiff had undertaken the rehabilitation and treatment of those stricken with poliomyelitis in Catawba County; and following the setting up of the Chapter became more actively engaged in treatment of polio patients; increased its contributions to the local Chapter, and during the period from 1938 to 1946 contributed according to the books of plaintiff, approximately $900,000 to the Catawba County Chapter. Much of this amount was spent in the erection and equipping of a hospital in Hickory; bringing in doctors and nurses from various sections of the country to staff it, together with the incidental expense that came about from setting up this emergency institution.

Catawba County has suffered two major polio epidemics, in which hundreds of children were stricken with this dread disease. The first of these epidemics came about in 1944 and necessitated the establishment of this hospital, and brought about what at that time was often referred to as "The Miracle of Hickory". The Piedmont area of North Carolina seemed to be the spot in which the disease was more generally found, and almost over night a situation of dire calamity faced this section. Catawba County and particularly the Hickory area seemed to be in its center, and plaintiff thereupon, in conjunction with the local Chapter and through the efforts of many citizens, established the hospital for the treatment of the disease. It seemed that everyone, sensing the appalling situation and recognizing the great catastrophe that was in their midsts, valiantly set to work and in due time produced a most helpful result. Each evidently became impressed with the thought that the responsibility was his and virtually cast aside all thought of personal position and gave wholeheartedly of his efforts toward achieving the aims sought. Doctors who were trained in polio treatment joined the hospital in Hickory, gave other doctors the benefit of their knowledge, and experience,—worked determinedly and almost continuously in an effort to aid the afflicted and to stop the spread of the disease in this area. Volunteer nurses worked long hours, man gave of

his time and effort and performed the most menial tasks. Everyone had a part, and in due time, after many difficult experiences, the situation brightened and ultimately cleared up. It, however, left many who were stricken and who obviously would need aid through the years.

Again in 1958 a similar experience came about, however less serious and obviously less destructive.

In the first epidemic of 1944 children from all sections were brought to Hickory, and out of those treated, approximately 15% came from Catawba County parents.

In addition to the amount expended by plaintiff of approximately nine hundred thousand dollars, if further during the years from June 1945 to January 1954, made advancements in funds for epidemic purposes to Catawba County in the sum of $104,189.01.

During the period from 1948 to 1956, inclusive, there was collected in Catawba County from the yearly March of Dimes the total sum of $333,453.25. $157,262.-85 being forwarded to plaintiff as its 50% of the net amounts received, and a similar amount retained by the local Chapter for use in Catawba County as set out in the Campaign handbook.

All of those who had a part in this program in Catawba County, and many of them were a part of it from the beginning, worked gratuitously and the record is to the effect that none of them made any charges whatever for their services. Dr. A. Gaither Hahn who headed the Foundations' effort from the very beginning gave almost continuously of his time, and many others who took a full part likewise sought only to aid, and accepted no compensation, being satisfied with the plaudits of a benefited people for their labors. The Hickory Record, a daily newspaper, sensing the unusual need for money, through the efforts of its staff, voluntarily collected and contributed $90,000 beyond the March of Dimes collection.

The funds that became available for use in the treatment of those stricken and which is administered through the National Foundation and the local Chapters, are raised through the annual March of Dimes conducted in January of each year. The National Foundation operates the March of Dimes drive with the appointment of State Directors in the several states of our country, who in turn appoint local Directors to aid in the various counties of those states. These Local Directors are sent campaign handbooks from State Headquarters and in that manner are acquainted with the prescribed formula for the campaign to be waged and of the disposition of monies contributed by the public. Each handbook is similar and through the years contained the following formula: "One half of all funds received from the March of Dimes remains with the local Chapter to pay for services to polio patients. The other half goes to Headquarters of the National Foundation for Infantile Paralysis and is used for (1) Research, (2) Education, the training of doctors, nurses and physical therapists in the modern method of treating polio; (3) Epidemic aid advances to supplement depleted local chapter treasuries in meeting patient care costs."

It is generally admitted by all that the individual defendants and everyone having a part in the March of Dimes campaign in Catawba County widely played up the idea that 50% of the net amount received would remain at home for the care of Catawba County children. The March of Dimes campaign has always been an outstanding success in Catawba County. This came about through the fact that so many Catawba County children had been stricken and was in part a repayment by those in the county who appreciated the wonderful service and the almost miraculous cures that had come to the afflicted children in this section.

As an illustration, Catawba County stood first among the one hundred counties in North Carolina in per capita giving in 1954 and 1955, and second in 1956. Catawba County likewise was third in total dollar volume contributions, being

outranked by only Guilford in first place and Mecklenburg in second. It further appears that in 1956 the per capita contributions were more than twice as large as the national per capita rate, and approximately three times as great as the North Carolina statewide rate. It indicates that a grateful people have generously contributed toward the needs of suffering humanity.

From the evidence it appears that the Catawba County Chapter on December 31, 1955, had a cash balance of $17,673.-34, and that it received from the March of Dimes campaign conducted in January 1956 and other receipts the sum of $23,-294.22, a total of receipts during 1956 of $40,967.56. That it expended for treatment for the three new cases which came to it in 1956 the sum of $1,000; that it expended for patient care for the remaining 275 cases, all stricken before 1956, the sum of $3,859.14; and that with other disbursements including equipment for hospitals, clinics, and polio drive expenses, the sum of $3,880.-77, which left a cash balance on December 31, 1956, of $32,227.65.

During the year 1957 it received from the polio campaign and other advancements a sufficient fund to bring its total receipts for that year to $54,459.67. That during 1957 it expended for three new cases the same as for 1956, and the treatment of three hundred cases adopted by it as being stricken before 1957, the sum of $6,646.52; and other amounts for expense for patient care in hospitals and clinics, campaign expenses, etc., an additional sum of $3,102.54, a total expense for 1957 of $9,749.06, which gave to the local chapter a net cash balance on December 31, 1957, of $44,710.61, which amount was on hand together with certain accruals of interest at the time of the institution of this action.

During 1956 plaintiff, in laying its plans and arranging its budget for the next ensuing year, came to the decision that it would need a total of forty-seven and one half million dollars to carry into effect a program which it envisioned. Realizing that various local chapters had in possession a considerable amount of money which was unallocated and which likely would aggregate six million dollars, it advised its campaign directors that its intent and purpose was to call upon the various chapters of the National Foundation, which had in their possession uncommitted funds, to submit those funds to National Headquarters to be used for the benefit of all chapters in their programs of aid to patients. Thereby in employing these funds as it contemplated it would be possible to reduce its total request to the public to approximately forty-one and one half million dollars. In that means it would use the uncommitted funds and replenish the treasuries of the chapters which had exhausted their funds. This need for the chapters where the funds were exhausted came about through the Salk vaccine program that became effective in 1957.

Thereafter and on September 16, 1957, the Board of Trustees of plaintiff unanimously passed the following resolution:

"That all uncommitted funds presently in the respective Chapter treasuries over and above the normal operation requirements of the individual chapters through March 31, 1958, be forwarded immediately to National Headquarters to be in turn distributed to those chapters which are in need of financial assistance.

"Further resolved that the president of this Foundation be, and he hereby is, authorized to establish a procedure at such time or times as he deems advisable for calling in from the National Foundation's Chapters uncommitted funds this day directed to be forwarded to National Headquarters for distribution to those chapters in need of financial assistance."

Later on September 30, 1957, plaintiff's president wrote to the various chairmen of the chapters of the National Foundation, including the Catawba County Chapter, a letter which in substance referred to the resolution of the

Board, the needs for Chapters with un-committed funds to aid National Head-quarters so that there could be a re-dis-tribution to the needy chapters and re-quested specifically of all chapters, in-cluding the Catawba County Chapter, to forward its uncommitted funds; and setting out a formula by which such un-committed funds should be computed and determined.

From the grand total of assets held by the Catawba County Chapter, which as plaintiff contended were uncommitted of $54,459.67, plaintiff undertook to esti-mate the Chapter's 1957 disbursements on using as its yardstick the previous expenditures in other years, for patient aid and administration, in the sum of $4,859.14, and additionally set up the sum of $7,096.57 to be retained as a provision for vaccine promotion—made provision for minimum cash balance as of December 31, 1957, of $1,214.78, and allowing as a total deduction of the amount on hand of $13,172.49, and there-upon requested that the local chapter forward to it the difference of $41,287.-18. And such is the amount, together with interest, as may be accrued to date, which is sought herein and which be-comes the subject of this particular law-suit.

On the receipt of such request for the uncommitted funds as interpreted by plaintiff, the Board of Trustees of the local chapter discussed the request fully and unanimously came to the decision that whatever funds were now on hand belonging to the local chapter would all be needed if and when during the en-suing years it would carry out the intent and purpose of its formation,—that of looking after the polio victims, in Cataw-ba County; that there were approxi-mately three hundred boys and girls who needed rehabilitation; that it stood com-mitted to pay the expenses of the Salk vaccine innoculations for any Catawba County child whose parents were finan-cially unable to pay for such vaccina-tion, and that all funds possessed by the Chapter were committed to the fulfill-ment of its program. Additionally it

contended that there was no national emergency and that it was not called up-on to expend its money which had come to it from the percentage it received from the various March of Dimes cam-paigns conducted in the past and from the savings which it had effected through gratuitous giving of services, earned in-terest, and general frugality exercised. That it was not liable to forward such funds to plaintiff and it thereupon re-fused to follow plaintiff's request.

It further took the position that in the two former years when at plaintiff's re-quest it had forwarded checks, one in the sum of $1,000 and another in the sum of $2,280.46, that such was an instance and not a policy, and that in so doing it rec-ognized the evident need for funds for those particular times, and consequent-ly sent checks in such amounts.

Thereafter additional correspondence passed between the parties hereto which were not productive of any results and finally on May 9, 1958, seemingly after all efforts to persuade the Catawba Coun-ty Chapter to comply with the request of September 30, 1957, plaintiff's President by letter informed the Chairman of the Catawba County Chapter that he thereby withdrew the Certificate of Recognition of the Catawba County Chapter. No ap-peal as is provided in the Manual for Chapters was perfected and subsequent-ly on July 29, 1958, this action was in-stituted.

The local Chapter has the funds under its control on deposit with the following associations: Federal Savings and Loan, First Savings and Loan Association, both of Hickory, North Carolina; Fideli-ty Federal Savings and Loan Associa-tion of Catawba County, of Conover, North Carolina; and the Citizens Sav-ings and Loan Association of Newton, North Carolina; in each is deposited the sum of $12,000, evidenced by stock cer-tificates aggregating a total of $48,000. There is also on deposit in the First Na-tional Bank of Catawba County, Hickory, North Carolina, in a checking account, the sum of $546.13. The difference in the amount as originally computed and

that actually on hand comes about from the accrual of interest. Each of the deposits is in the name of the Catawba County Chapter of the National Foundation for Infantile Paralysis, Inc.

In addition there is on deposit with the Fidelity Savings and Loan Association the sum of $2,000 in the name of "A Special Equipment Fund of the National Foundation for Infantile Paralysis, Catawba County Chapter." This fund is a part of an amount raised in 1954 by means of a benefit baseball game sponsored by the law enforcing agencies of Catawba County and being created was set up for the benefit of *equipment for local work.* Originally it was under the direct control of Austin E. Smith, former Sheriff of Catawba County, and on being reported to plaintiff, was refused for acceptance and has never been recognized by plaintiff as a part of the funds belonging to the local chapter.

All of the above banking houses, in filing answer, created no issue thereby and each aptly set forth that it stood to abide the orders of the court and that it would honor such draft based on the judgment in the cause and as directed by the court.

Subsequent to May 19, 1958, the date on which plaintiff notified Dr. Hahn that it was revoking the charter of the Catawba County Chapter, it undertook to organize and establish a new Chapter in Catawba County, but was not successful in such effort. However it did secure the services of citizens who were agreeable to establish a temporary Patient Care Committee, which, on being set up, functioned as best it could under all the circumstances. Plaintiff thereafter forwarded to this Temporary Care Committee the sum of $2,000 and from the report made by such committee to plaintiff, it appears that approximately $1,300 had been spent in the interest of taking care of Catawba County patients who were in need of treatment. Plaintiff likewise through its various agencies undertook to learn of any unpaid bills that might be outstanding in Catawba County and frequently sought advice in such matters from those who might know, and requested from Dr. Hahn, the defendant Chapter's President, custody and control of the records so that it, among other things, could ascertain the names of patients who needed such treatment and attention.

This is a very unfortunate controversy in that through it a fine going program has been completely disrupted and from which naturally much lack of treatment to the needy patients has come about and a great deal of suffering has probably resulted.

The March of Dimes campaigns have not been set up and carried out in Catawba County for the last three years, and though an honest effort has been made by certain vitally interested citizens, the zest of the program has not been present and the receipts have fallen far short of those originally received.

The main question in this case is whether the plaintiff can revoke the Charter and doing so, take possession of the money and property held by the local Chapter,—and thereafter administer it.

It seems a case of first impression for that I am not cited to any cases having a direct bearing thereon; in fact those cited cases are far afield of the questions involved in this action. I therefore consider the contract entered into, its reasonableness, etc., for the answer to be found.

The relationship of the parties to this action is a contractual one, and in order to properly evaluate the respective rights and positions of plaintiff and defendants, it is necessary to determine the character of the contract by the terms of which their relationship existed.

■■ It must always be remembered that courts construe a contract as in this instance, which is not of their making, and the terms of which they cannot alter. The plaintiff and the defendants had a legal right to make any contract with each other,—not unlawful in itself, since both were dealing at arm's-length. The case must be decided, therefore, not

by what we may think would have been a wiser and more discreet agreement on the part of the parties, but by what is said in the contract actually made by them. Courts are not at liberty to re-write contracts for the parties, being only the interpreter of the words. The court must determine what they meant by what they have said,—what their contract is, and not what it should have been as they contend.

Let us look at the actions and deeds, and the paperwritings that constitute the record in the case and from that determine the contractual relationship between the parties.

■ The original Certificate of Organization of the Catawba County Chapter, adopted by it over the signatures of its various officers, contained, in part, among other things as we have found, this provision:

"This Chapter shall, and hereby does, agree with the National Foundation for Infantile Paralysis, Inc., to engage in infantile paralysis activities in conformity with the Manual for Chapters and the policies, rules and regulations prescribed and to be prescribed by the Board of Trustees of the National Foundation for Infantile Paralysis, Inc."

From the various findings of fact herein it definitely appears that plaintiff, among other things, reserved unto itself in the Manual for Chapters, the right to control the policy of all of the local chapters in the country and being in control thereof to have them operate in such way as to legally comply with all reasonable rules, and regulations. That it possessed the right on a disagreement arising, to withdraw the Certificate of Recognition and prescribed the means and methods by which such should come about, together with the notice that should be given. Provision for an appeal is likewise made and finally, among other things, the final determination of the funds and property, its ownership, and control, if and when a Certificate of Recognition has been withdrawn.

The defendant local Chapter accepted all of these rules and regulations and took no exception thereto and each of these rules was outstanding and effective at the time the disagreement herein arose.

On these findings of fact, somewhat lengthy it is true, but all necessary as the court feels, I conclude as a matter of law:

That the plaintiff is entitled to all of the funds that were heretofore held by the Catawba County Chapter of the National Foundation for Infantile Paralysis, Inc.

And as such is entitled to have each institution having said funds on deposit to pay such funds to plaintiff, for that when the Certificate of Recognition was withdrawn by plaintiff from the local Chapter its functions ceased and its control over the funds ended.

That all of the defendants, individually and in their capacity as representatives of all persons claiming any right, title or interest in, or authority over, the property of plaintiff, by reason of membership in the former Catawba County Chapter are enjoined from interfering with or claiming any right, title or interest in and to the property herein held to belong to plaintiff, of whatever kind and wherever found, and having possession of such property, are required to surrender it to plaintiff.

Since plaintiff has broadened its field of activity to include research, professional education, and patient aid in virus diseases, arthritis, birth defects and central nervous system disorders, in addition to poliomyelitis, subsequent to the withdrawal of the Certificate of Recognition from the Catawba County Chapter, it will not be permitted to expend any of the funds herein adjudged as its property for any of the activities in the new fields which it has gone into subsequent to the withdrawal of the said Certificate of Recognition from the local chapter.

That since plaintiff has disavowed any ownership or control of the sum of $2,-000 which is on deposit with the Fidelity

Savings and Loan Association in the name of "A Special Equipment Fund of the National Foundation for Infantile Paralysis, Catawba County Chapter," such fund is to be retained by such institution and its withdrawal is subject to the authority of those who control it other than the plaintiff.

Since the decree based on these findings of fact and conclusions of law will carry the findings that plaintiff is owner of such fund and entitled to disburse it under its charter, for the use and benefit of those to whom intended, the Court retains jurisdiction and authority over the recovery herein and requires that plaintiff submit to the Court at least as often as every six months, during the administration of this fund, a concise statement of the disbursements from such fund. This authority is held by the Court in view of the fact that the monies herein represented donations made by the people of Catawba County for the purposes intended, among which was their determined interest shown in taking care of polio victims of Catawba County. This fund in that sense is impressed with such trust.

Plaintiff is further directed on acquiring said fund to set up the amount received under a special entry, so that through the years there can be disbursed therefrom the amounts that have been expended for treating those stricken with polio in Catawba County and the aid and patient care that they might need.

It is further determined that those having possession of the list of polio patients give such list or a copy thereof together with the addresses, ages and any other information that might be contained thereon to plaintiff so that it can carry out its obligations and responsibilities and effectively render the aid necessary to these polio victims.

The costs in this case will be paid from the funds received by the plaintiff under this decree.

Counsel will submit to the court decree carrying into effect these findings.