THE NATIONAL FOUNDATION, a corporation, Appellant,

v.

FIRST NATIONAL BANK OF CATAWBA COUNTY, N. C., a banking corporation, et al., Appellees.

No. 8160.

United States Court of Appeals Fourth Circuit.

Argued Oct. 18, 1960.

Decided March 23, 1961.

8. Sidney v. Commissioner, 2 Cir., 273 F.2d 928; Mintz v. Commissioner, 2 Cir., 284 F. 2d 554.

**832**

Harry C. Hewson, Charlotte, N. C. (Hunter M. Jones and Robinson, Jones, & Hewson, Charlotte, N. C., on the brief), for appellant.

Young M. Smith, Hickory, N. C. (Smith & Keener, Hickory, N. C., on the brief), for appellees.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

HAYNSWORTH, Circuit Judge.

This action arose out of a contest between The National Foundation and its associated Catawba County (North Carolina) Chapter for control of certain proceeds of March of Dimes campaigns in Catawba County. The District Judge, construing the governing contract, decided that The National Foundation, rather than its Catawba Chapter, was entitled to control and administer the funds, but held that the funds were impressed with a public trust restricting their use to the care and treatment of Catawba County victims of poliomyelitis.[1] The National Foundation has appealed from that portion of the order which restricts its exercise of its discretion in the use of its funds in furtherance of its general purposes.

The National Foundation is a New York corporation, the name of which, prior to June 9, 1958, was The National Foundation for Infantile Paralysis, Inc. For many years, it had been engaged in a national campaign to prevent infantile paralysis and to treat and care for its victims, raising funds for that purpose through annual campaigns known as the March of Dimes. The change of its name in 1958 was the result of an expansion of its purposes to include other diseases than poliomyelitis and defects causing paralysis and the rehabilitation and treatment of victims of such diseases and defects.

The National Foundation began work in the care of victims of poliomyelitis in Catawba County, North Carolina several years prior to 1941. In 1941, a group of citizens of Catawba County organized the Catawba County Chapter of The National Foundation for Infantile Paralysis as an affiliate of The National Foundation and agreed to be governed by The National Foundation's "Manual for Chapters, and the policies, rules and regulations prescribed, and to be prescribed, by the Board of Trustees for The National Foundation for Infantile Paralysis, Inc."

A severe poliomyelitis epidemic occurred in 1944 in the Piedmont Section of North Carolina. Catawba County was

1. National Foundation v. First National Bank of Catawba County, D.C.W.D.N.C., 182 F.Supp. 919.

the approximate center of the epidemic area. At a cost of approximately $900,-000, The National Foundation constructed an emergency hospital at Hickory, in Catawba County, brought in doctors and nurses, and, there, provided care and treatment for the victims of the disease in the epidemic area. The result of these efforts was so good that it became known as "The Miracle of Hickory."

As an indirect result of the epidemic of 1944 and the milder one of 1948, the people of Catawba County became generous contributors to the March of Dimes campaigns. Their annual giving was at a per capita rate of approximately twice the national average and approximately three times the North Carolina average. In addition, a retired physician living in Catawba County began to devote substantially all of his time to the work, and did so for many years without compensation, while other citizens of the County gave generously of their time, their goods, and their services.

In the years prior to 1955, this program had required The National Foundation to advance funds in substantial amounts for expenditure in Catawba County. In addition to the $900,000 it advanced to combat the epidemic of 1944, The National Foundation advanced to its Catawba County Chapter, or for expenditures in that County, the additional sum of $104,189.01, these advances having been made during the years 1945 through 1954. During the next several years, however, necessary expenditures in Catawba County were substantially less than that proportion of the net receipts from the annual March of Dimes campaigns in that county which were allocated initially to the local chapter. There resulted a build up of the funds of the Catawba County Chapter. The chapter in April 1957 purchased building and loan certificates aggregating $40,000, and in April 1958 it purchased an additional $8,000 of such certificates.

During 1957 The National Foundation called upon its Catawba County Chapter to transfer to it its surplus funds after provision for its anticipated requirements through March 31, 1958. The National Foundation considered that the Catawba County Chapter then had surplus funds and resources of some $41,287.18. The Catawba County Chapter refused to remit that or any other sum. The National Foundation, taking the position that the Catawba County Chapter had no right to refuse its demand that funds in the amount specified be transferred to the immediate control of The National Foundation, revoked the charter of the chapter and this action followed.

The National Foundation had provided in its Manual for Chapters that it would determine each year what proportion of the net proceeds of the annual campaign for funds would be left in the localities for administrative purposes, but that, unless otherwise determined, fifty per cent of the net proceeds would be left with the chapters for administration by them and fifty per cent would be transmitted to the headquarters of The National Foundation for direct use by it in connection with its administration, research, training of doctors and nurses, and in providing needed assistance to localities in meeting emergency conditions such as those which arose in Catawba County as a result of the epidemics of 1944 and 1948. In general, that administrative division of funds had been adhered to, except in 1954 when one-third was left with the chapters, one-third went to The National Foundation for its usual purposes and one-third went to a special program in connection with the prevention of poliomyelitis.

The Manual of Chapters also provided that the chapter could not accept any gift except for purposes specified in the Manual, nor could it, without the prior consent of The National Foundation, accept any gift restricted to use by the chapter. In 1954, law enforcement agencies of Catawba County raised funds to purchase equipment for local work. Of these funds, a gift of $2,000 was tendered the Catawba County Chapter on condition it be used to purchase equipment for work in Catawba County. Because of the condition, the gift was re-

fused by The National Foundation and the tendered gift remained unexpended in a special deposit.

The Manual of Chapters also provided that all funds coming into the custody of a chapter "belong to and are trust funds and property of The National Foundation to be expended only for the purposes provided in its Certificate of Incorporation and only in accordance with the rules, regulations and policies prescribed by it from time to time." It provides that if a chapter fails or refuses to follow the rules, regulations or policies of The National Foundation, the President may withdraw the chapter's certificate of recognition, from which action the chapter may appeal to the Foundation's Committee on Chapters.[2] It is specifically provided that when a certificate of recognition is surrendered or withdrawn, all of the chapter's funds and property, including books, files and records, shall be delivered to The National Foundation.

The District Judge properly construed the Manual for Chapters by which the Catawba County Chapter had agreed to be governed as creating no entity separable from The National Foundation, itself. He concluded that all of the funds belonged to The National Foundation, and that transfers of funds between The National Foundation and the chapter were for administrative purposes only, as an individual might move some of his cash from one of his pockets to another. He could hardly come to any other conclusion, for the local chapter's claim to the funds, adverse to The National Foundation's, is clearly inconsistent with its agreement. It was entirely proper and appropriate, therefore, for him to direct, as he did, that the funds be turned over to The National Foundation for administration by it.

In spite of this conclusion, however, the District Court found these funds were impressed with a trust restricting their use for the care and treatment of the victims of poliomyelitis in Catawba County.[3] He did so because he found that in the fund raising campaigns of 1955, 1956 and 1957, the promoters in Catawba County had publicly emphasized the fact that fifty per cent of all contributions would be left with the chapter for local administration, and because The National Foundation's activities were then restricted to poliomyelitis and its victims.

We need not consider whether the individual defendants, members of the former Catawba County Chapter, have standing to enforce the sort of public charitable trust which the District Court found to exist,[4] for we think the circumstances do not disclose the imposition of any trust.

It is true that the donors, or some of them, to the campaigns of 1955, 1956 and 1957 were told that fifty per cent of the net proceeds of the campaigns would be left for administration by the local chapter, and many of the donors may have been motivated by the need of their neighbors for assistance. Clearly the appeal in those years was founded solely upon need in the fight against poliomyelitis without reference to other diseases or defects. The evidence does not show, however, that any donor, other than the donor of the special equipment fund, which The National Foundation refused to accept and does not claim, imposed any condition whatever upon his gift. Nor does it appear that any donor was told, or had reason to believe, that funds initially left in the administrative control of the chapter could not be used by the chapter to repay prior advances or, if the total amount of such funds

2. The Catawba County Chapter took no such appeal from the action of The National Foundation's President in withdrawing its certificate of recognition.

3. In prior years funds administered by the Catawba County Chapter had been used to treat polio victims of neighboring coun-

ties as well as those of Catawba County, notwithstanding the neighboring counties also had local chapter affiliates of The National Foundation.

4. See Restatement of Trusts 2d, § 391; General Statutes of North Carolina, § 36-23.1(3).

proved to be in excess of reasonable short term need, the excess might not be diverted elsewhere to meet pressing need.

The individual defendants, who were active members and officials of the chapter, must have known that the initial administrative division of the funds was not a final and irrevocable determination, and that surplus funds could be reallocated subsequently in the light of relative need. The Chapter had been advised that the prior advances by The National Foundation to it were not loans and were not expected to be repaid out of funds under the administrative control of the chapter unless and until the chapter accumulated funds in excess of current need, in which event application of the excess funds to repayment would be expected. In addition, The National Foundation in 1955 had called upon the chapters in general to remit surplus funds in their hands, and the Catawba County Chapter had responded by remitting a thousand dollars. They knew in advance of the 1957 campaign that they might expect a similar call to be made upon them during 1957, and the call was made in September of that year.

It thus appears that The National Foundation did nothing to mislead members of its local chapter. Nor was there anything in the publicity in aid of the campaigns of 1955, 1956 and 1957 which could be called a general deception of the public. Fifty per cent of the proceeds of each of those campaigns was initially delivered to the chapter and subjected to its administrative control. Everyone understood and intended that it would remain there so long as and to the extent that it was needed in the work of the local chapter and in the care and treatment of local victims of poliomyelitis. Particularly in the light of the prior advances of The National Foundation to the Catawba County Chapter, a request in 1957 that surplus funds [5] be applied in partial repayment of prior advances does not seem so inconsistent with the general publicity as to require a finding that the earlier publicity was deceitful.[6]

It is apparent, therefore, there can be spelled out from the facts no more than the making of unconditional gifts upon representations which may have influenced the motivation of donors. If the donors so motivated had expressed their purposes in precatory language, under the laws of North Carolina, which govern us, they would have imposed no enforceable restriction upon The National Foundation's use of the funds. St. James Parish v. Bagley, 138 N.C. 384, 50 S.E. 841, 70 L.R.A. 160.

If donors had declared their purpose to be to contribute to the fight against poliomyelitis and, particularly, to assist its Catawba County victims, they would have done no more than to express in summary fashion the intention of The National Foundation with respect to the use of these funds. There is nothing in such a declaration which implies a restrictive purpose that excess funds after all needed assistance has been rendered to Catawba County victims should be held in idleness in Catawba County against the possibility of some need in some future year when the excess funds could find present gainful employment elsewhere in the general fight against the disease. Nor would such a declaration imply a restrictive purpose that The Na-

5. On December 31, 1955, there was a cash balance in the administrative control of the Catawba County Chapter of $17,673.-34. From the net proceeds of the campaign in January 1956, $23,294.22 was delivered into the administrative control of the chapter, bringing its total receipts to $40,967.56. Its disbursements in 1956 totalled only $8,739.91, so that it had a cash balance on December 31, 1956 of $32,227.65. In 1957, it had additional receipts of $22,232.02, which added to the balance on hand as of the end of the prior year brought its total receipts to $54,-459.67. During 1957, its total disbursements were only $9,749.06, so that it came to the end of 1957 with a cash and investment balance of $44,710.61, without inclusion of accrued and accruing interest on its building and loan certificates.

6. The District Court did not find anything in the publicity in the nature of fraud or deceit.

836

tional Foundation, when financially able to do so, might not expand its purposes to include assistance to paralytics suffering similar disabilities resulting from other causes than poliomyelitis.

Even if donors had included in expressions of their motivation reference to The National Foundation's corporate powers as then defined in its charter and to the plan of local administration of half of the net proceeds of the campaign, it would still amount only to precatory declarations giving rise to no enforceable restriction upon the discretion of The National Foundation in the exercise of its corporate powers. If we may infer motivation from what they were told or might have known, we cannot infer that those who said nothing about it expressed their motivation in terms of legally enforceable restrictions. The fact that donors responded to these appeals with unrestricted gifts cannot be construed as a manifestation by them of an intention to create a charitable trust with more limited purposes than those of the donee, The National Foundation.[7]

Every gift to The National Foundation, in a sense, is a gift in trust. Its use, with other gifts, is limited to activity in furtherance of the donee's corporate purposes, or to such other purposes to which they properly might be applied under the *cy-pres* doctrine. Donated funds are dedicated to the charitable objects of the corporation and may not be diverted to other use. Unless a donor manifests an intention to impose other restrictive conditions, it should be assumed he intended to leave to the donee the right to exercise the discretion it has in the application of other funds to its charitable purposes.

Manifestation of such a purpose might be found in response to a special appeal for funds to serve a specific objective or purposes more limited than those in the service of which the corporate donee is properly engaged. These were the annual March of Dimes campaigns, however. They were the annual campaigns through which The National Foundation routinely has raised funds for use in furthering all of its charitable purposes. Campaign publicity generally descriptive of its plan of operations and its administrative practices was intended to influence prospective donors to give, and we may assume it did, but it furnishes no basis for an inference that the donors, by their response, manifested an intention to so restrict their gifts that plans of operation and administrative practices might not be altered to increase the effectiveness of The National Foundation's service of its objectives. At least, so long as victims of poliomyelitis in Catawba County received adequate and proper care and assistance, as they did, we find no manifestation by the donors of an intention that excess funds should not be used to repay earlier advances when such repayment would contribute to the attainment by The National Foundation of its charitable objectives.

The decree of the District Court will be affirmed insofar as it directs that these funds be turned over to The National Foundation. It should be modified, however, to eliminate the restrictive conditions imposed upon the use of the funds and the requirement that periodic reports disclosing their application be filed with the court.

Affirmed in part; reversed in part and remanded.

---

7. See Restatement of Trusts 2d, § 351; St. James Parish v. Bagley, 138 N.C. 384, 50 S.E. 841, 70 L.R.A. 160.