**STEVENS BROS. FOUNDATION, INC.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 17332.

United States Court of Appeals
Eighth Circuit.

Nov. 15, 1963.

Frank J. Hammond, of Briggs & Morgan, St. Paul, Minn., John M. Sullivan and John J. King, St. Paul, Minn., on the brief, for petitioner.

Ralph A. Muoio, Attorney, Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., and Meyer Rothwacks, Attorney, Dept. of Justice, Wash., D. C., on the brief, for respondent.

Before SANBORN and MATTHES, Circuit Judges, and ROBINSON, District Judge.

MATTHES, Circuit Judge.

This case is before us on petition to review a decision of the Tax Court which sustained, to a large extent, the Commissioner's assessment of deficiencies in corporate income and personal holding company taxes, and penalties against Stevens Bros. Foundation, Inc. (Foundation). The questions on review are whether the Tax Court erred in holding that:

(1) Foundation had—

(a) not been operated exclusively for charitable purposes during its taxable years 1948 through 1955;

(b) unreasonably accumulated income during its taxable years 1952 through 1958;

and therefore that Foundation was not exempt from taxation as a charitable organization during its taxable years 1948 through 1958.

(2) The Commissioner did not abuse his discretion in *retroactively* revoking a 1947 ruling exempting Foundation from taxation as a charitable organization.

(3) Foundation was a personal holding company for the taxable years 1952 through 1954, and 1956 through 1958.

(4) Foundation was subject to additions to tax for failure to file corporation income tax returns for its taxable years 1948 through 1954, and for failure to file personal holding company tax returns for its taxable years 1952, 1953, and 1954.

(5) Foundation failed to prove that it incurred capital losses of $9,849.40 due to the worthlessness of certain securities it held.

(6) Foundation received ordinary income of $25,778.24 from the Cheatham Lock project in 1955, rather than a long-term capital gain of $48,306.44 and an ordinary loss of $22,528.20.

The basic facts, in the main stipulated and undisputed, are set forth at length in the Tax Court's opinion, 39 T.C. 11 (1962). Certain background features of this controversy are stated in Stevens Brothers & Miller-Hutchinson Co. v. Commissioner, 24 T.C. 953 (1955). Rather than reiterate the facts in detail, we need only restate those necessary to highlight the nature of the issues now before us.

Foundation was incorporated under the laws of Delaware on December 31, 1942, by Edward Fenton Stevens (Stevens), his wife, and two of his brothers, and maintains its principal office in St. Paul, Minnesota. Six other persons—related to Stevens either by blood or marriage—were subsequently admitted to membership in Foundation.

In 1943, Foundation applied for exemption from federal income taxes as a charitable corporation, and by letter of May 1, 1947, was granted exempt status by the Commissioner, subject to redetermination if Foundation should change its character or purpose or its method of operation. There is no doubt that Foundation was *organized* for charitable purposes and that its charter so provided.

The four founders of Foundation were also partners in Stevens Bros. Contractors (Partnership), and shared equally in Partnership's profits until the death of one partner in 1955; thereafter, the remaining three persons shared equally. During the years here involved, Partnership owned two-thirds of the stock of a construction company known as Stevens Bros. & Miller-Hutchinson Company, Inc.

(Corporation). Stevens was president of Corporation and R. C. Hutchinson—who had no interest in Foundation or Partnership—was its secretary-treasurer.

In 1947, Hutchinson, who was then in active charge of Corporation, consulted with Stevens about bidding on a contract to build the floor at the Algiers Locks in Louisiana. The Government required a bid bond, and the surety company had informed Hutchinson that it would not issue a bond on Corporation's bid unless an additional $50,000 in cash was absolutely subordinated to the contract. "[C]orporation's funds were pretty well tied up" at that time in other jobs, and the bank with which Corporation normally did its business refused to lend it the additional money. On May 29, 1947, Foundation's board of directors agreed to advance $50,000 to Corporation in return for one-third of the profits from the job, plus repayment of the advance.

Shortly thereafter, Hutchinson advised Foundation that the surety company now insisted on having $75,000 subordinated to the contract instead of the previous $50,000 requirement. On July 1, 1947, the earlier agreement was cancelled, and Foundation agreed to advance the larger amount to Corporation in return for one-half of the profits from the contract, plus repayment of the advance. Corporation's bid was accepted, and Foundation advanced the $75,000.

In 1948, Foundation advanced an additional $40,000 to Corporation to pay for certain material required before further work could be done on the project. No additional consideration was received by Foundation for this $40,000, but the sum was ultimately returned.

Before the Algiers Lock floor contract was completed, Corporation bid on the contract for erection of the walls at the same lock, received the award, and unsuccessfully attempted to secure a bond for the contract bid without being required to furnish additional funds. After Corporation's bank once again would not advance the funds, the agreement between Foundation and Corporation covering the floor contract was extended to the wall contract, and the $75,000 previously advanced was left with Corporation.

Before the wall contract was completed, Corporation was invited by T. L. James & Company, Inc. (James) to bid on the contract for the Cheatham Lock project in Tennessee. James and Corporation were awarded the contract and agreed to divide the profits from the project equally. Since Foundation then extended the financial terms of the Algiers Lock project agreement to cover the Cheatham Lock project, half of Corporation's share of the profits under the Cheatham contract was to go to Foundation. In addition to the $75,000 covered by the extended agreement, Foundation also advanced $25,000 on August 20, 1951, and $50,000 on October 4, 1951 for use on the Cheatham Lock project.

The $75,000 original advance and the $75,000 additional investment in the Cheatham Lock project in 1951 were returned to Foundation about 1953, and its construction project relationship with Corporation was terminated in 1954. Foundation was adequately compensated for its involvement in the construction projects, and no part of the profits it derived from them was diverted to its members.

Sometime in 1947 or 1948, Stevens secured a patent for a therapeutic heating device for Foundation. The costs of developing and manufacturing the heaters were incurred by Partnership and treated as a gift by it to Foundation. Foundation distributed free of charge to hospitals, old folks' homes, and individuals about 100 heaters worth approximately $4,510.25.

About 1952, Foundation began making educational loans to college students. Repayment was waived in the case of most or all of the 32 loans, totaling $4,605, made during Foundation's taxable years 1953 through 1955. For its taxable years 1956 through 1958, Foundation made 36

loans, totaling $7,496, which are extended without question when a student advances a good reason for delay in payment.

Foundation's books indicate receipts, disbursements and student loans as follows:

| Fiscal Year Through | Contributions received and other income | Expenses | Contributions, Gifts, Grants, Etc. | Student Loans | Surplus Balance |
|---|---|---|---|---|---|
| 1947 | $105,611.75 | 139.87 | 4,227.50 | -0- | 101,244.38 |
| 1948 | 87,810.98 | 27.00 | 1,245.25 | -0- | 187,783.11 |
| 1949 | 35,024.83 | 19,315.75 | 235.00 | -0- | 203,257.19 |
| 1950 | 181,471.85 | 24,715.33 | 1,825.00 | -0- | 358,188.71 |
| 1951 | 94,967.41 | 19,237.00 | 1,000.00 | -0- | 432,919.12 |
| 1952 | 73,782.91 | 19,230.00 | 1,250.00 | -0- | 486,222.03 |
| 1953 | 38,317.89 | 19,295.00 | 2,090.00 | -0- | 503,154.92 |
| 1954 | 19,741.79 | 9,630.00 | 3,931.64 | -0- | 509,335.07 |
| 1955 | 20,680.41 | 1,450.00 | 2,015.00 | -0- | 526,550.48 |
| 1956 | 14,331.00 | 1,392.20 | 2,150.00 | 770.00 | 537,339.28 |
| 1957 | 24,278.26 | 3,571.00 | 1,600.00 | 1,725.00 | 556,446.54 |
| 1958 | 49,014.52 | 2,050.55 | 1,725.00 | 5,001.00 | 601,685.51 |
| Total | $745,033.60 | $120,053.70 | $23,294.39 | $7,496.00 | |

Partnership loaned certain sums of money to Foundation from February, 1946, to October, 1953. The total outstanding on the first day of any month during that period ranged from $496,973.71 to $969,211.62, and averaged $783,266.59 for that period. Foundation paid no interest on these loans through 1948, and thereafter until 1954 paid various rates of interest. Since 1954 Foundation has not borrowed funds from Partnership or from any other source and has not paid any interest to Partnership.

At the time of trial herein, Foundation's investments had a total value of $950,000.

On or before August 20, 1953, Foundation's members determined a plan to accumulate $1,000,000 in Foundation, from which they calculated an annual income of $50,000 could be derived. They deemed this income sufficient to meet expenses and still carry out Foundation's charitable purposes.

On information returns for each of its taxable years 1948 through 1954, Foundation answered "No" to the following questions:

"Have you had any sources of income or engaged in any activities which have not previously been reported to the Bureau? . . . . . . . . . .
(Yes or No)

If so, attach detailed statement."

By letter dated August 24, 1954, Commissioner notified Foundation that its tax exempt status was revoked. By letter dated September 8, 1954, the District Director at St. Paul notified Foundation that it was liable for federal corporation income tax returns and enclosed forms for the years 1948 to 1953, inclusive. After audit, various conferences and other negotiations, Commissioner notified Foundation of specific deficiences by letter of June 14, 1960.

### 1—Exemption Issue

### (a)—Non-Charitable Operation

Under § 101(6) of the Internal Revenue Code of 1939 and § 501(c)(3) of the 1954 Code, an organization is entitled to

be exempt from taxation if it satisfies the following conditions: (1) it must be organized and operated exclusively for religious, charitable * * * or educational purposes; (2) no part of its net earnings can inure to the benefit of any private shareholder or individual; (3) it cannot engage in substantial political or lobbying activity.

The crucial question here is whether Foundation's participation in the Algiers and Cheatham Lock projects supports the Tax Court's finding that it was not operated "exclusively" for charitable purposes and that such involvement was "to a substantial extent an effort to benefit its founders." In our view, this is largely a fact issue and, being so, the finding of the Tax Court must stand unless it is clearly erroneous or was induced by an erroneous view of the law. See and compare Samuel Friedland Foundation v. United States, D.N.J., 144 F.Supp. 74, 85 (1956); Cleveland Chiropractic College v. C. I. R., 8 Cir., 312 F.2d 203, 204 (1963).

■ The meaning of the term "exclusively" as used in the statutes is no longer open to debate. In Better Business Bureau of Wash., D. C. v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L. Ed. 67 (1945), the Supreme Court, in giving effect to § 811(b) (8) of the Social Security Act (in terms substantially the same as § 501(c) (3) of Int.Rev.Code), made this pronouncement:

"In this instance, in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. This plainly means that the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." 326 U.S. at 283, 66 S.Ct. at 114, 90 L.Ed. 67.

See also, Duffy v. Birmingham, 8 Cir., 190 F.2d 738 (1951); American Institute for Economic Research v. United States, Ct.Cl., 302 F.2d 934 (1962), cert. denied, 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141 (1963); Scripture Press Foundation v. United States, Ct.Cl., 285 F.2d 800 (1961), cert. denied, 368 U.S. 985, 82 S. Ct. 597, 7 L.Ed.2d 523 (1962); Leon A. Beeghly Fund v. Commissioner of Internal Revenue, 35 T.C. 490, 523 (1960), affirmed 310 F.2d 756 (6 Cir. 1962).[1] So here, in order for Foundation to occupy exempt status, it must be devoted to *charitable* purposes *exclusively,* and if there is present in its operations a single noncharitable purpose substantial in nature, though it may have other truly and important charitable purposes, it is not entitled to be exempt.

Foundation insists that its participation in the Algiers and Cheatham Lock projects was incidental to its tax exempt purposes, was not in furtherance of substantial nonqualified purposes, and that the benefits derived by its founders from such transactions were of an incidental nature. Additionally, Foundation emphasizes that it benefited from the business ventures to the extent of $178,387.-55. From the foregoing, Foundation reasons that it was in fact operated exclusively for charitable purposes within the concept of the teachings of the Supreme Court in Better Business Bureau v. United States, supra, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67.

■ We have accorded these and other arguments advanced by Foundation due and careful consideration and are not persuaded that the finding of the Tax Court on this issue is clearly erroneous. To the contrary, we are convinced that such finding is supported by substantial evidence and that in reaching its conclusion the Tax Court applied the proper legal standards. In the final analysis,

1. In Beeghly, the Tax Court found that the Fund was not operated "exclusively" for charitable purposes and thus that it was not tax exempt. But, on another ground, the Tax Court held that the Fund had no deficiency in income tax. On appeal by the Commissioner, the Sixth Circuit affirmed the Tax Court without reaching the issue of "charitable operation."

it cannot be denied that the funds of Foundation were used in an appreciable amount and in a manner which, while beneficial to Foundation, also resulted in a substantial benefit to its founders. It was hardly a coincidence that Foundation was contacted by Mr. Hutchinson and asked to give financial support to Corporation's construction ventures. Upon a reasonable assessment of the undisputed facts, a logical inference is that Foundation came to the rescue of Corporation at a time when the latter was unable to procure additional financing from its bank and other sources and when it was hard put for the requisite amount of cash necessary to satisfy the bonding company, and that Foundation made it possible for Corporation to bid on the projects. And, of course, it is of prime significance that the controlling interest in Corporation was owned by the individuals who constituted Partnership and who also were the creators of Foundation. The amount involved in the construction projects belies the assertion that these business ventures were merely incidental, or that the profit, as channeled through Corporation to Partnership and ultimately realized by Foundation's creators, was of an incidental nature. In our view, the questioned activities and the use made of Foundation funds in connection with such activities closely parallel, in principle, the situation in Leon A. Beeghly Fund, supra, 35 T.C. 490, where, as here, the organization forfeited its tax exempt status because of such activities. We are likewise of the view that Samuel Friedland Foundation v. United States, supra, 144 F. Supp. 74, upon which Foundation places strong reliance, is readily distinguishable and not controlling herein.

On the noncharitable operation issue we sustain the Tax Court.

*(b)—Unreasonable Accumulations*

■ Encompassed within the exemption issue, the Tax Court also found that

Foundation had unreasonably accumulated income during its taxable years 1952 through 1958. We affirm this finding.

Under § 3814 of the Internal Revenue Code of 1939 [2] and § 504 of the 1954 Code (the successor to § 3814), tax exempt status is denied to any organization described in § 501(c)(3) of the 1954 Code,

"if the amounts accumulated out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year—

"(1) are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose or function constituting the basis for such organization's exemption * * *."

In the Friedland case, supra, 144 F. Supp. at 92, the court, in considering the yardstick to be applied in determining whether accumulations were unreasonable, stated,

"What the true test appears to be is this,—Does the charitable organization have a concrete program for the accumulation of income which will be devoted to a charitable purpose and in the light of existing circumstances is the program a reasonable one?"

While realizing that no formula is devisable for determining reasonableness in all cases, the court pointed to four significant factors to be considered, applied them to the facts, and found that Friedland Foundation had a definite and reasonable program and a charitable object for accumulation. These factors were: (a) Purpose of accumulation and dollar goal—$500,000 for construction of medical research center at Brandeis University; (b) Funds available at starting point to be devoted to accumulation—$50,000; (c) Likelihood of further contributions—$50,000 per year; and (d) Extent of time required to reach dollar goal—6, 7 or 8 years.

**2.** § 3814 of the 1939 Code was enacted in 1950, § 333 of Act September 23, 1950, provided in part that this section should apply with respect to taxable years beginning after December 31, 1950.

In Erie Endowment v. United States, 3 Cir., 316 F.2d 151 (1963), the Third Circuit, confronted with the same problem, affirmed the district court's holding that the accumulations were unreasonable. In so doing, the court took note of the ruling of the Tax Court in this case, see Note 16, 316 F.2d at 155, stated that the factual situations in the two cases were comparable, see Note 19, 316 F.2d at 155, 156, and also made the following general pronouncement:

" 'Reasonableness,' that hobgoblin of judicial minds, can only be divined on the basis of all relevant facts. The standard to be applied is whether the taxpayer can justify the total accumulation of income at the end of the taxable year, in terms of both time and amount, on the basis of a rational total program of charitable intent. The plan must be viewed in its entirety. An eight year plan of accumulation to provide a medical research center for a university costing $500,000 may be reasonable; so may a ten year period of accumulation to build up sufficient funds to pay retirement benefits to employees where that is the sole purpose of the foundation; so may accumulation for the purpose of obtaining sufficient funds to construct and maintain a civic building where the charitable organization was formed for that specific purpose." 316 F.2d at 155.

Mindful of these principles, we are impelled to conclude that the Tax Court here correctly decided that the accumulations were unreasonable within the meaning of the statute. Several salient facts stand out. Foundation did not have a concrete or definite charitable program requiring the accumulation of a large percentage of its income. Under its corporate charter, Foundation possessed broad charitable powers, but the fact remains that it failed to formulate and design a meaningful charitable program, one having a definite functional objective. We recognize that at some time during the years in question—the Tax Court found that it was on or before August 20, 1953— Foundation determined that its dollar goal value would be $1,000,000, and that based upon a 5% return, its annual investment income would be $50,000. We have also considered that in 1951 or 1952 Foundation began making educational loans to students attending colleges. However, these loans and grants were not made as the result of any formulated or definite plan and such aid was not geared to the amount of Foundation's income. In the absence of a concrete program no reasonable justification appears for the large accumulations for the years in question.[3]

■ Neither are we impressed with Foundation's argument that the Tax Court improperly considered accumulations prior to the enactment of the unreasonable accumulations statute in 1950. As demonstrated, this Act operated prospectively to deny tax exempt status. However, it is clear from the wording of the statute that accumulations of the taxable year and preceding years are to be *considered* in resolving the question whether the accumulations were unreasonable. See Erie Endowment v. United States, supra, 316 F.2d at 156, fn. 20.

### 2—Retroactive Revocation Issue

By letter dated May 1, 1947, the Commissioner informed Foundation that it was exempt from federal income tax under the provisions of § 101(6) of the Internal Revenue Code and that "accordingly, you will not be required to file income tax returns unless you change the character of your organization, the purposes for which you were organized, or your

---

3. The Tax Court determined that—"if we adopt the approach of Friedland [supra, 144 F.Supp. 74] in determining the amount of 'excess' accumulations"— Foundation's "excess" accumulations, as of its taxable year 1958, totaled—*"per petitioner's books"*—$443,372.34. Using the Tax Court's figures in this regard, Commissioner points out that Foundation accumulated approximately 78% of its income during the years before the court, while spending only 3% for charitable purposes.

method of operation. Any such changes should be reported immediately to the collector of internal revenue for your district in order that their effect upon your exempt status may be determined." As previously stated, the Commissioner revoked this tax exemption ruling by letter to Foundation dated August 24, 1954. Thereafter, the Commissioner applied the revocation ruling retroactively.

■ The Commissioner is empowered to prescribe the extent to which any ruling made by him shall be applied retroactively. Section 7805(b) of the 1954 Code provides:

"The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

This section is substantially the same as its predecessor—§ 3791(b) of the 1939 Code. In Automobile Club of Mich. v. Commissioner, 353 U.S. 180, 184, 77 S. Ct. 707, 1 L.Ed.2d 746 (1957), the Supreme Court stated that it is clear from the language of the foregoing statute and its legislative history that Congress thereby confirmed the authority of the Commissioner to correct any ruling, regulation or treasury decision retroactively, but empowered him, in his discretion, "to limit retroactive application to the extent necessary to avoid inequitable results."

"The Commissioner's action may not be disturbed unless, in the circumstances of this case, the Commissioner abused the discretion vested in him by § 3791(b) of the 1939 Code." 353 U.S. at 184, 77 S.Ct. at 710, 1 L.Ed.2d 746.

See and compare, Birmingham Business College, Inc. v. C. I. R., 5 Cir., 276 F.2d 476 (1960); Lesavoy Foundation v. Commissioner of Internal Revenue, 3 Cir., 238 F.2d 589 (1956); Cleveland Chiropractic College v. C. I. R., supra, 8 Cir.,

312 F.2d 203.[4] Thus, the question for decision here is whether the Commissioner acted arbitrarily in directing that the ruling be applied retroactively.

Foundation's efforts to demonstrate that its information reports were adequate and sufficient to apprise the Commissioner of its entry into the business activities which led to denial of its tax exempt status are far from convincing. By way of summary, it appears that on July 1, 1947, shortly after the tax exempt ruling, Foundation became involved with Corporation in the Algiers Lock project, but failed to disclose this fact to the Commissioner in its information return filed for its taxable year which ended March 31, 1948. To the contrary, Foundation answered "No" to the question:

"9. Have you had any sources of income or engaged in any activities which have not previously been reported to the Bureau? . . . . . . . . . .
 (Yes or No)
If so, attach detailed statement."

Foundation also failed to disclose its assets and liabilities as required on "Schedule A—Balance Sheets" of the information return. Likewise, Foundation in its returns filed for taxable years ending March 31, 1949, March 31, 1950, and March 31, 1951, disclosed no information of its activities with Corporation, although as previously shown, it became further involved in the lock projects. The first hint of the transactions appeared in Foundation's information return filed for the year ending March 31, 1950, when under heading "10—Other Income," Foundation reported "Algiers Lock Investment—$128,410.60." This amount was more than 10% of the total income reported for that year, but Foundation failed to attach an itemized schedule in accordance with the instructions. Again in its 1951 return, Foundation reported under "Other Income—Algiers Lock Investment—$24,198.71," and again also failed to attach the required itemized

---

4. The revocation of taxpayer's exempt status in Cleveland Chiropractic College was applied retroactively. However, this was not an issue on appeal and is not mentioned in our opinion.

schedule. Apparently, examination of the 1951 return and discovery of the $24,198.71 item of income caused the Commissioner to begin the investigation which resulted in his revocation of the 1947 ruling.

The foregoing events and the ensuing correspondence between Commissioner and Foundation negate arbitrary action or an abuse of discretion by Commissioner.

Foundation seeks to draw an analogy between this case and Lesavoy Foundation v. Commissioner, supra, 238 F.2d 589, where the Third Circuit reversed the Tax Court, 25 T.C. 924, which had sustained the Commissioner's retroactive revocation of a certificate of exemption from taxation issued to a charitable organization. In our view, Lesavoy is readily distinguishable. There, unlike the present situation, the Foundation reported on its information return that it had engaged in "activities which have not previously been reported to the Bureau," revealed that it had purchased a spinning mill company, and attached a balance sheet listing assets, inventory, liabilities, and gross receipts which reflected substantial sales of yarn and cloth.

On this issue we affirm the Tax Court.

### 3—Personal Holding Company Issue

Sustaining the Commissioner in part, the Tax Court held that Foundation qualified as a personal holding company for its taxable years 1952 through 1954 and 1956 through 1958. We reverse the Tax Court on this issue.

Under the Personal Holding Company statute, § 501(a) of the 1939 Code and § 542(a) of the 1954 Code, the term "personal holding company" means any corporation (with certain exceptions not pertinent here) if—(1) at least 80 percent of its gross income for the taxable year is personal holding company income as defined in another section (502 of 1939 Code, 543 of 1954 Code), and (2) at any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.[5]

As in the Tax Court, Foundation here concedes that it meets test (1)—i. e., it had the requisite kind of income to be a personal holding company. The crucial question is whether the requirements of test (2) are present—i. e., whether Foundation's "members" are of the general equivalence of stockholders in stock corporations so as to satisfy the stock ownership test.

The provisions of Foundation's corporate charter pertinent to this issue provide that: the corporation does not have authority to issue capital stock; the four incorporators shall be members upon payment of $1 each to the corporation; no part of the corporation's net income shall inure to the benefit of any member; and the corporation has broad powers to amend any provision of the charter. The charter does not provide for distribution of assets upon dissolution.

Although Foundation never issued capital stock or amended its charter, Commissioner contended in the Tax Court that because of the reserved power to amend the charter, Foundation's members had the right to share in its property upon dissolution and therefore were equivalent to stockholders in stock corporations. The Tax Court held that for the taxable year 1948 Foundation's memberships did not correspond to stock

---

5. During the years in question, Foundation had no more than ten members. The Tax Court reduced the number to five for personal holding company purposes under the "ownership attribution" rules of the Code (§ 503 of the 1939 Code and § 544(a) (2) of the 1954 Code). Although Foundation asserts that these rules could only become applicable after an actual merger by it with a profit corporation (if such merger is possible), Foundation does not dispute the finding that the family relationship between its members is sufficient to reduce the owners to five or less under the rules, if such determination is to be made regardless of an actual merger. Since we dispose of the personal holding company issue on another ground, further consideration of this phase of the issue is unnecessary.

holdings for personal holding company tax purposes, but on a theory of its own, sustained the Commissioner on this issue as to other taxable years.

In 1951 the Delaware legislature amended its Revised Code of 1935 to permit consolidation of or merger between stock and non-stock corporations. This amendment added a new section to the Delaware Revised Code of 1935, now appearing as § 257, Title 8, of Delaware Code Annotated, and reading in pertinent part as follows:

" § 257. (a) Any one or more non-stock corporations, whether organized for profit or not organized for profit, organized under the provisions of this chapter, or existing under the laws of this State, may consolidate or merge with one or more stock corporations, whether organized for profit or not organized for profit, organized under the provisions of this chapter, or existing under the laws of this State, into a single corporation which may be any ·one of the constituent corporations or a new corporation to be formed by means of such consolidation or merger as shall be specified in the agreement provided for in subsection (b) of this section. The new corporation or the surviving constituent ·corporation may be organized for ·profit or not organized for profit and may be a stock corporation or a membership corporation.

" * * * In such consolidation ·or merger the interests of members of a constituent non-stock corporation may be treated in various ways so as to convert such interests into interests of value, other than shares of stock, in the proposed new or resulting stock corporation or into shares of stock in the proposed new or resulting stock corporation, vot-

ing or non-voting, or into creditor interests or any other interests of value equivalent to their membership interests in their non-stock corporation."

Without supporting authority, the Tax Court concluded that "despite the fact that the predecessors of Del.Code Ann. tit. 8, secs. 102(a) (4), 242(a), and 281, set forth supra,[6] were not amended by this 1951 Act, we conclude that the Delaware Legislature intended to and did change the law to give to members in nonstock corporations the right to share in the current or accumulated profits of those corporations," and that for the taxable years 1952 through 1958 Foundation's memberships constitute "stock" within the meaning of the Personal Holding Company statute.

Although we sustain the determination that Foundation was not an exempt organization for *federal* income tax purposes, the present issue posits the question whether under *state law* the property of a charitable organization can be distributed or paid to its members by way of dividends or ultimately on dissolution. The Commissioner recognizes that we look to the state law in resolving this question, and in his brief, states:

"Taxpayer is a nonstock, nonprofit corporation organized under the General Corporation Law of Delaware * * * and its certificate of incorporation makes no provision for the disposition of assets in the event of dissolution. However, on the basis of the relevant state law, the Tax Court determined that, prior to 1951, members of a Delaware nonstock nonprofit corporation could not share in the assets of the corporation on liquidation * * *. Accordingly, it found that prior to that time taxpayer's memberships were not equivalent to stock for personal

6. These provisions of Del.Code Ann. tit. 8 —dealing in part, respectively, with formation of non-profit, non-stock corporations, with charter amendments, and with distribution of balance upon corporate liquidation—were interpreted by the Tax

Court, in light of Delaware decisional law, as forbidding—prior to 1951—distribution of accumulated profits to members of a non-profit, non-stock corporation on liquidation.

holding company purposes because they lacked the necessary beneficial interest in the assets of the corporation."

Specifically, then, we must decide whether the 1951 amendment was intended to cover *charitable* non-stock, non-profit corporations so as to permit Foundation to merge with a profit, stock corporation and to give Foundation's members—as held by the Tax Court—the right to share in the current or accumulated profits of Foundation, even though there was no actual merger. Foundation states that the Tax Court's interpretation of the amendment—now Title 8 Del.Code Ann. § 257—endangers the status of existing charitable corporations under Delaware law, and, in effect, prohibits the formation of new ones. Commissioner, in support of the Tax Court's self-spun theory, argues that for state law purposes, a charitable corporation is not endangered in Delaware, for it will remain charitable in nature until merged with a stock company. Opposed to Foundation's contention that the doctrine of *cy pres* would prevent its funds from being diverted to its members, Commissioner further asserts that the doctrine, although applied in Delaware as to charitable trusts, has not yet been applied as to charitable corporations "and would appear to be foreclosed by the 1951 amendment. * * *" Commissioner points to the general liberality of Delaware corporation law, asserts that "the legislature apparently saw fit to allow" such mergers, and on oral argument, revealed that perhaps the Delaware statute "would permit a church to merge with a large profit corporation."

 In our view, the Tax Court's interpretation of § 257 is diametrically opposed to prevailing principles of law dealing with charitable corporations. Generally, on the dissolution of a charitable corporation, the doctrine of *cy pres* is applicable, and a gift to the corporation does not revert to the donor—and, to be sure, cannot be distributed to the members of the charitable corporation. See IV Scott, Trusts § 397.3, at 2797–2798

(2d ed. 1956). Ordinarily, the principles which are applicable to charitable trusts are applicable to charitable corporations —certainly the doctrine of *cy pres* pertains to both, and "it is probably more misleading to say that a charitable corporation is not a trustee than to say that it is. . . ." IV Scott, Trusts § 348.-1, at 2559, 2553–2554 (2d ed. 1956); National Foundation v. First National Bank of Catawba County, 4 Cir., 288 F. 2d 831, 836 (1961); Miller v. Mercantile-Safe Deposit & Trust Company, 224 Md. 380, 168 A.2d 184, 188 (1961); Trustees of Rutger's College in N. J. v. Richman, 41 N.J.Super. 259, 125 A.2d 10, 26 (1956). It has been held that the legislature has no power to destroy or to vary the terms of a valid charitable trust. IV Scott, Trusts § 348, at 2552 (2d ed. 1956). Additionally, the power of amending a corporate charter cannot be exercised to entirely change the nature of a corporation, or to change substantially its objects and purposes. Fletcher, Cyclopedia Corporations, Vol. 7, Ch. 43, § 3718, at 886 (Perm. ed.).

With these general rules in mind, we turn to Delaware law to determine whether its legislature and its courts have adhered to the prevailing principles. We, like the Tax Court and the parties to this action, recognize that the Delaware statutory law here involved has not been construed by the courts of that state insofar as it applies to non-stock, non-profit corporations. Nevertheless, upon careful scrutiny of Delaware statutory and decisional law, we are firmly convinced that the Tax Court's interpretation of that law is erroneous.

 The Delaware courts have recognized that "[g]enerally speaking, the law favors charitable trusts, and they will not be declared void if they can by any possibility, consistent with law, be considered as good." Union Methodist Episcopal Church v. Equitable Trust Company, 32 Del.Ch. 197, 83 A.2d 111, 114 (1951). Construing a testamentary bequest in trust for a charitable purpose, the Court of Chancery of Delaware, in Delaware Trust Company v. Graham, 30

Del.Ch. 330, 61 A.2d 110, 113 (1948), stated that there "seems to be no good reason why judicial cy pres should not be applied in appropriate cases by this court." Other Delaware decisions dealing with charitable trusts have also recognized the validity of, the *cy pres* doctrine, although the courts have not always considered its application appropriate under the facts involved. See, for example, Union Methodist Episcopal Church v. Equitable Sec. Tr. Co., Del.Ch., 177 A.2d 217 (1962); First National Bank & Trust Company v. First National Bank & Trust Company, 35 Del.Ch. 449, 121 A.2d 296 (1956); Union Methodist Episcopal Church v. Equitable Trust Company, supra, 83 A.2d 111. Furthermore, under the doctrine of *cy pres*, the Delaware legislature cannot divert the corpus of a trust to uses other than those specified, nor may it terminate a charitable trust or change the methods of its administration. "Legislation respecting a charitable trust is valid if in aid of its purpose and not in destruction or impairment of the interests arising under it." Trustees of New Castle Common v. Gordy, 33 Del.Ch. 334, 93 A.2d 509, 515, 40 A.L.R.2d 544 (1952).

▇ It is also interesting to note that in Denckla v. Independence Foundation, Del.Ch., 181 A.2d 78, 83 (1962), the Delaware Court of Chancery, while finding it unnecessary to determine the validity of plaintiff's assertion "that an incorporated charitable foundation is governed by the same rules of law as are charitable trusts," did state:

"Determination of the issues presented here is dependent upon the extent of the powers conferred upon Independence by its certificate of incorporation. If the power to make the contested grant is either expressly or by necessary implication given by its charter then it matters not whether trust law or corporate law is applicable. Conversely, if the power is not so given the grant is ultra vires and ineffective, at least in the absence of unanimous mem-

bership approval, and, perhaps, even then." 181 A.2d at 83.

Moreover, we find that Delaware, like other American courts, also favors charitable corporations, and in cases involving such institutions, is "not confined to the same orthodox concepts which once were applicable to every situation * *." Danby v. Osteopathic Hospital Association of Delaware, 34 Del.Ch. 427, 104 A.2d 903, 907 (1954). Other cases, such as Society for Propagation of Faith of Diocese of Wilmington v. Joswick, Del. Ch., 180 A.2d 617 (1962) and Equitable Security Trust Co. v. Home for Aged Women, 35 Del.Ch. 553, 123 A.2d 117 (1956), further emphasize that the Tax Court's interpretation of § 257 would frustrate Delaware's policy toward charitable institutions.

▇ Since statutes are presumed to have some effect, § 257 must be interpreted as allowing many types of non-profit, non-stock corporations to merge with profit corporations. But a non-profit corporation is not necessarily charitable in nature, Read v. Tidewater Coal Exchange, 13 Del.Ch. 195, 116 A. 898 (1922), and allowing a merger between a profit corporation and a certain type of non-profit corporation is a far cry from allowing merger between a charitable corporation and a profit corporation, and allowing assets pledged to charitable purposes to be diverted to private gain. In our view, if such a drastic change was intended, the Delaware legislature would have spoken more clearly; it would have specifically referred to charitable corporations by name—as it does in various other sections of the Code whereby certain charitable associations are granted various rights and exemptions. See, Del. Code Ann., tit. 8, §§ 313, 361(a) (4), 501; tit. 30, § 1902.

▇ To sustain the Tax Court on the personal holding company issue, we would, among other determinations, be obliged to hold that: (1) under § 257, Foundation *could* merge with a profit corporation, and that therefore Foundation's memberships were converted to interests

of value; (2) such interests were the equivalent of stock; and (3) the Delaware legislature, by implication in § 257, intended to prevent the courts from applying the doctrine of *cy pres* to charitable corporations. Such determinations, in our view, would not coincide with how the Delaware courts would interpret § 257 if they were called upon to do so. We reverse the Tax Court on this issue.

### 4—Additions to Tax Issue

The Tax Court assessed penalties under § 291(a) of the 1939 Code for failure of Foundation to file income tax returns for its taxable years 1948 through 1954 and personal holding company tax returns for its taxable years 1952 through 1954.

In summary, § 291(a) provides that in case of any failure to file a tax return within the time prescribed by law, unless it is shown that the failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax a certain percentum thereof not to exceed 25% in the aggregate.

The Tax Court considered all of the facts and circumstances bearing upon this issue, carefully considered Foundation's contentions, applied what it regarded to be the applicable rule, and found that Foundation did not have reasonable cause for failure to file the returns for the years stated.

■ The question whether the failure to file returns was due to reasonable cause and not due to willful neglect is "one of fact in the first instance for the * * * [Tax Court's] determination." Commissioner v. Lane-Wells Company, 321 U.S. 219, 225, 64 S.Ct. 511, 514, 88 L.Ed. 684 (1944). In Coates v. Commissioner of Internal Revenue, 8 Cir., 234 F.2d 459, 462 (1956), Judge Sanborn, speaking for the court, stated:

> "We agree with the statement of the Tax Court that whether or not reasonable cause exists for failure to file the required declaration is a question of fact to be decided upon the peculiar circumstances of each case."

To the same effect are Sami v. United States, 5 Cir., 277 F.2d 153 (1960); Southeastern Finance Company v. Commissioner of Int. Rev., 5 Cir., 153 F.2d 205 (1946). Cf. also Heman v. C. I. R., 8 Cir., 283 F.2d 227 (1960).

■ Foundation seeks to demonstrate that reasonable cause existed for its failure to file the income tax returns. Its principal argument is grounded on the 1947 ruling of the Commissioner that it was exempt and not required to file such returns. Of course, the exemption ruling ostensibly justified the failure to file such returns. However, since we have determined that the Commissioner was justified in retroactively revoking the exemption ruling for failure to furnish material information, such reason ceases to exist. See Birmingham Business College, Inc. v. C. I. R., supra, 276 F.2d at 482.

We have carefully considered all arguments advanced by Foundation and are satisfied that the Tax Court's determination that Foundation is subject to additions for failure to file the income tax returns for the years 1948 through 1954 should be affirmed. Inasmuch as we have determined that Foundation was not a holding company and was therefore not required to file personal holding company tax returns, there is no basis for those additions, and the Tax Court's decision in that regard is reversed.

### 5—Worthless Securities Issue

■ Foundation claimed capital losses in its taxable year 1949 totaling $9,849.40, alleging that the stock it held in Denver & Rio Grande Railway and in St. Louis & San Francisco Railway became worthless in that year. The Tax Court sustained the Commissioner's disallowance of the claimed capital losses on the ground that Foundation "failed to sustain its burden of proving the stock became worthless during the period before the Court."

In contending that it incurred such losses in 1949, or alternatively in 1948 or 1950, Foundation relies *entirely* upon the opinion-testimony of its president,

Stevens. The Tax Court obviously was not impressed with Stevens' testimony, determined that the testimony was of little value in fixing either the fact or time of worthlessness, and—contrarily—pointed to other evidence suggesting the stock probably was not worthless in 1949. On this record, we cannot hold that the Tax Court's determination—a finding of fact—was clearly erroneous. See Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Boehm v. Commissioner, 326 U.S. 287, 292–293, 66 S.Ct. 120, 90 L.Ed. 78 (1945); Midland Ford Tractor Company v. C. I. R., 8 Cir., 277 F.2d 111, 115 (1960), cert. denied, 364 U.S. 881, 81 S. Ct. 169, 5 L.Ed.2d 102 (1960); Cohen v. Commissioner, 2 Cir., 148 F.2d 336, 337 (1945).

### 6—Long-Term Capital Gain Issue

After completion of the Cheatham Lock project, Corporation sold the steel sheet piling and division equipment used on the project. Foundation contends that, if it is not tax exempt, its share of the profit realized from the sale of the piling and the equipment is a long-term capital gain under § 1231 of the Internal Revenue Code of 1954. The Tax Court affirmed the Commissioner's determination that the profit constituted ordinary income and not capital gain.

To qualify as a long-term capital gain under § 1231, the profit must have been realized from the sale of "property used in the trade or business." Such property, according to § 1231(b), must (1) be used in the trade or business; (2) be subject to the allowance for depreciation; and (3) be held for more than six months.

The Tax Court sustained Commissioner's determination as to the steel pilings on the ground that Foundation failed to satisfy its burden of proving that it or Corporation had held the pilings for more than six months. Based largely upon the testimony of Stevens, the Tax Court found that the pilings had been transferred to the Corps of Engineers during the construction project, causing an interruption in the holding period so as to disqualify the property from capital gain treatment under the "6-month" requirement of § 1231(b). Foundation contends that the Tax Court's finding is erroneous in that Stevens' testimony was somewhat inconsistent and that "a fair interpretation of Mr. Stevens' testimony is there was no *real* or *actual* interruption of the holding period."

While there can be no doubt that Stevens' testimony was not entirely consistent, it furnished a substantial basis for the Tax Court's finding. On review, primary emphasis must be given to the evidence which supports the inferences drawn by the Tax Court, Commissioner v. Scottish American Company, 323 U.S. 119, 123–124, 65 S.Ct. 169, 89 L.Ed. 113 (1944); Card v. Commissioner, 8 Cir., 216 F.2d 93, 96–97 (1954), and a choice between two permissible views of the weight of the evidence is not clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S. Ct. 177, 94 L.Ed. 150 (1949). Thus, in view of the lack of evidence to the contrary, we cannot overturn the finding that Foundation failed to prove that it held the pilings for more than six months, and thus that it could not treat its share of the profit from their sale as a capital gain.

In sustaining the Commissioner's denial of capital gain treatment for the *equipment*, the Tax Court merely stated that Foundation had not proved the equipment was depreciable as required by § 1231(b). No one disputed Stevens' testimony that the equipment was used on the Cheatham project and that it, but "not the supplies," had depreciated. The Commissioner never suggested to the Tax Court that Foundation had not shown the depreciable nature of this equipment, and the point was not at issue below.

To be sure, the Tax Court is the judge of the credibility of witnesses who appear before it, and of the weight of evidence produced. But, under the circumstances of this case, we believe that Foundation "might fairly have assumed

that the respondent was not questioning or controverting" its assertions or its evidence as to the depreciable nature of the equipment. Royal Highlanders v. Commissioner of Internal Revenue, 8 Cir., 138 F.2d 240, 245 (1943). While the Tax Court may not have been required to find for Foundation upon the evidence it produced, the court should have afforded Foundation an opportunity to verify its position since the "depreciation issue" had not really been raised. On the equipment portion of the issue we reverse and remand to allow either party an opportunity to present evidence as to whether the equipment was depreciable, and thus to determine whether Foundation's share of the profit from its sale was a long-term capital gain under § 1231.

### Conclusion

In accordance with our determinations as set forth in the opinion, we affirm in part, reverse in part, and reverse and remand in part.