DEMETRIO BOULAFENDIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; EVELYN BOULAFENDIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boulafendis v. Commissioner
Docket Nos. 13273-79, 13340-79.
United States Tax Court
T.C. Memo 1984-321; 1984 Tax Ct. Memo LEXIS 350; 48 T.C.M. (CCH) 351; T.C.M. (RIA) 84321; June 25, 1984. *350 In 1970, petitioners transferred at least $75,000 to petitioner-wife's father and a business associate of the father to invest in a cargo ship. Petitioners did not recover any of their investment, except for $5,000 recovered during 1978. Held: (1) Petitioners have failed to prove that they did not have a reasonable prospect of recovering their investment in the ship by the end of 1974, the only year in issue. Consequently, petitioners are not entitled to a 1974 deduction on account of theft, bad debt, worthless stock, or transaction entered into for profit. Secs. 165 and 166, I.R.C. 1954. (2) Petitioner-husband's failure to file a timely income tax returns for 1974 was not due to reasonable cause; he is liable for an addition to tax under sec. 6651(a)(1), I.R.C. 1954. Rudy M. Groom and Andrew W. Miller, for the petitioners. William H. Lester, Jr.,James N. Mullen,Daniel A. Taylor, Jr., and Dennis R. Onnen, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6651(a)(1)[1] *351 (failure to file timely returns) against petitioners for 1974 as follows: Addition to Tax
Docket No.
Petitioner
Deficiency
Sec. 6651(a)(1)
13273-79
Demetrio
$72,951.45
$18,237.86
Boulafendis
13340-79
Evelyn
73,361.34
[2] 18,340.34
Boulafendis
These cases have been consolidated for trial, briefs, and opinion. The issues for decision are as follows: (1) Whether, and to what extent, each petitioner is entitled to a theft loss deduction for 1974 under section 165; (2) If not, then whether each petitioner is entitled to a deduction for 1974 for a loss from a transaction entered into for profit or from worthless securities, under section 165; or to a nonbusiness bad debt deduction under section 166; and (3) Whether petitioner-husband is liable for an addition to tax under section 6651(a)(1). FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, petitioners Demetrio Boulafendis (hereinafter sometimes refereed to as "Demetrio") and Evelyn Boulafendis (hereinafter sometimes referred to as "Evelyn"), husband and wife, resided *352 in Houston, Texas. During at least 1969 through 1974, petitioners resided in Texas. John Theocharidis (hereinafter sometimes referred to as "Theocharidis") and D. Th. Couvielos (hereinafter sometimes referred to as "Couvielos") were involved in a shipping business during 1970. Theocharidis was Evelyn's father. During Janury or February 1970, Theocharidis and Couvielos represented to Demetrio that they were going to buy a ship, the Captain Victor (hereinafter sometimes referred to as "the ship"), for a total cost of $750,000. Theocharidis and Couvielos asked Demetrio to invest about $250,000, which would be used to purchase and repair the ship. They told Demetrio that he would become a partner with them in the business of operating the ship if he made this investment. Theocharidis and Couvielos also told Demetrio that he would receive about $4,000 per month, beginning in April 1970, as his share of the ship's earnings. On February 6, 1970, Demetrio paid $50,000, which he had borrowed from the Texas Commerce Bank, to Theocharidis by personal check. On March 31, 1970, Demetrio paid $25,000 to Theocharidis and Couvielos by personal check. Demetrio intended that these payments were *353 to be used by Theocharidis and Couvielos as part of the down payment for, and repairs to, the ship. All payments made by petitioners to Theocharidis and Couvielos with respect to the ship were made by check. Marina Shipping Company (hereinafter sometimes referred to as "Marina"), a Liberian corporation, acquired ownership of the ship in or about April 1970. At this time, all of the issued stock of Marina was held by Theocharidis and Couvielos. On July 23, 1970, Evelyn paid $20,000 to Ten Fathoms West, Inc., a restaurant. Up to July 23, 1971, petitioners had not received an interest in the ship, any stock of Marina, or any other evidence of ownership to or claim in the ship. On or about July 23, 1971, a meeting was held between Theocharidis, Couvielos, and Demetrio about the failure of Theocharidis and Couvielos to supply Demetrio with proper evidence of petitioners' ownership in the ship. As a result of this meeting, Theocharidis (as president of Marina) and Couvielos (as secretary of Marina) executed a sworn document dated July 23, 1971 (hereinafter sometimes referred to as "the first letter"), which states, in relevant part, as follows: Dear Dr. Boulafendis: This letter will evidence *354 the obligation of Marina Shipping Company to issue to you thirty-three and one-third (33-1/3) shares of its outstanding and authorized capital stock in consideration of your payment of $235,000.00 to the Marina Shipping Company as consideration for such shares. The undersigned further represent that the total authorized capital of Marina Shipping Company is 100 shares. In July 1971, Demetrio obtained a loan from the Texas Commerce Bank in the amount of $140,000. On July 27, 1971, Demetrio deposited $100,000 of this loan in his personal checking account. On May 22, 1972, Marina sold the ship to the Maritime Shipping Company (hereinafter sometimes referred to as "Maritime"). At this time, the shareholders of Maritime were Theocharidis and Couvielos. Marina's books and records show a profit of $452,338.60 on the sale of the ship to Maritime. For the period from Marina's inception through May 22, 1973, its books and records show a total profit of $415,254.77, which includes the profit made on the sale of the ship. Marina's books and records show a distribution of $350,000 to Theocharidis and Couvielos on or about the same date as the sale of the ship to Maritime. Marina's books and *355 records do not reflect the receipt of any funds from petitioners. In June 1972, petitioners retained Sam Williamson (hereinafter sometimes referred to as "Williamson"), an attorney, to help them in their dealings with Theocharidis and Couvielos. Williamson reviewed the first letter and concluded that it provided petitioners with few or no legal rights with respect to the ship. On September 3, 1972, Theocharidis (both individually and as president of Marina) and Couvielos (only individually) signed a document (hereinafter sometimes referred to as "the second letter"), which was written by Williamson, that provides as follows: Mr. Sam Williamson Dear Mr. Williamson: This letter is to evidence my agreement, and the agreement of D. Couvielos, with Dimitri [sic] Boulafendis, who is my son-in-law, whom you represent. For and in consideration of the payment of $235,000 to us, the receipt of which by D. Couvielos and me I hereby acknowledge, which $235,000 we spent on the ship "Captain Victor" owned by D. Couvielos and me, we, D. Couvielos and I, sold and transferred to Dimitri [sic] Boulafendis a one-third interest in our business, which is to say, both D. Couvielos and I sold and transferred *356 to Dimitri [sic] Boulafendis one-third interest out of our interest in the ship "Captain Victor" or out of our equal shareholding in the corporation Marina Shipping Company, which held title to the ship. It was contemplated that Dimitri [sic] Boulafendis's [sic] interest and property vested in him on July 23, 1971, and it was our intention to make him an equal owner with D. Couvielos and me in the ship, and by the right to one-third of the shares in Marina Shipping Company which D. Couvielos and I were to transfer to him out of the shares held by Couvielos and me. Dimitri [sic] Boulafendis is entitled to an accounting of the ship's earnings, and the earnings of Marina Shipping Company from and after July 23, 1971. As soon as possible we intend to deliver to Dimitri [sic] Boulafendis evidence of his ownership of the "Captain Victor," or of his ownership in the shares of Marina Shipping Company, and an accounting. John Theocharidis, President John Theocharidis, Individualy [sic] D. Couvielos, Individually No stock in Marina was ever issued to petitioners. In 1974, Demetrio retained a second attorney, Dale Dossey (hereinafter sometimes referred to as "Dossey"), to help petitioners in *357 their transactions with Theocharidis and Couvielos. Dossey's father, a Certified Public Accountant, had represented Theocharidis and Couvielos from time to time and had some knowledge of their financial status. Dossey concluded that Theocharidis and Couvielos were "broke", and that petitioners had little chance of recovering any funds from them. Dossey wrote a letter to Theocharidis and Couvielos demanding that they repay petitioners. However, at Demetrio's instruction, he did not file a law suit against either one. At some time after Demetrio retained Dossey, Theocharidis became seriously ill and subsequently died of cancer. After 1974, the ship's operation came into great financial difficulty. In early July 1976, Demetrio advanced $7,000 to the ship for crew wages and other necessities of the ship. Petitioners' 1974 tax returns were filed on or about July 12, 1976. On these returns petitioners claimed a theft loss deduction of $250,000 (less the $100 limitation under section 165(c)(3)). The ship was seized pursuant to an order of the United States District Court for the Southern District of Texas, Houston Division, dated July 19, 1976, and issued with respect to the case of *358 Todd Shipyards Corporation v. M/V Captain Victor, C.A. No. 76-H-1202 (hereinafter sometimes referred to as "the Todd case"). On or about August 17, 1976, Dossey filed an intervening complaint on behalf of Demetrio in the Todd case which claimed that "During the period between approximately January, 1971, through approximately December, 1973, * * * Demetrio * * * provided * * * certain supplies and other necessaries" for the ship in the amount of $235,000. [3] *359 The complaint also claimed that during July and the first half of August 1976 Demetrio had again provided "certain supplies and other necessaries" for the ship in the amount of $15,000. [4] The total that Demetrio thus claimed to have provided is $250,000. In April 1978, pursuant to a court order in the Todd case, Demetrio received $1,000 in satisfaction of his intervening complaint. Also in 1978, Demetrio received an additional $4,000 in satisfaction of his intervening complaint under a settlement reached with another party to the Todd case. Except for these amounts, petitioners did not recover any of the amounts given to Theocharidis and Couvielos with respect to the ship. Demetrio is a cardiovascular surgeon. He performs an average of seven to eight operations per day during a usual work day of 15 to 20 hours. He devotes little time to nonwork matters. Demetrio relies on his accountant, tax lawyer, and secretary for the preparation and filing of his income tax returns. Demetrio does not know when a Federal individual income tax return is due. Dossey's father prepared Demetrio's 1974 Federal income tax returns, pursuant to instructions from, and based on information furnished by, Evelyn in or about April 1976. Demetrio never gave Dossey's father any instructions concerning the preparation of his 1974 return, or provided him with any information needed for the preparation *360 of the return. Petitioners filed separate Federal individual income tax returns for the year 1974, using the filing status of married filing separately. These tax returns were filed on or about July 12, 1976, On these tax returns, petitioners each reported one-half of the income from Demetrio's medical practice, and one-half of their allowable itemized deductions. Primarily as a result of the theft deductions claimed on account of the ship (see n. 5, infra), petitioners claimed on these tax returns that their aggregate chapter 1 tax liability was $116.67 ($0.78 for Demetrio and $115.89 for Evelyn) on aggregate adjusted gross income of more than $295,000. * * * Demetrio's failure to file his 1974 income tax return on time was not due to reasonable cause. OPINION I. Deduction
A. Theft Loss
Petitioners contend that Theocharidis and Couvielos made false representations to them regarding the ship that induced petitioners to transfer $235,000 [5] to them during 1970 and 1971, that these actions constitute a theft by false pretext, that this theft was discovered during 1974, and that petitioners had no reasonable prospect of recovering the $235,000 in that year. As a result, petitioners *361 contend, each of them is entitled to a theft loss deduction for 1974, under sections 165(c)(3) and 165(e), in the amount of $117,500. [6] Respondent contends that any loss petitioners might have suffered did not exceed $75,000, that no theft occurred, and that in 1974 there was a reasonable prospect for recovery. We agree with respondent's conclusion. Under section 165, [7] *363 *364 individuals may deduct losses arising from theft. Under section 165(e), a theft loss is treated as sustained "during the taxable year in which the taxpayer discovers such loss." However, notwithstanding such discovery, a loss is not treated as having been sustained unless it is evidenced by a closed and completed transaction, *362 and in particular, a loss is not treated as having been sustained so long as there is a reasonable prospect of recovery. Dawn v. Commissioner,675 F.2d 1077, 1078 (CA9 1982), affg. a Memorandum Opinion of this Court; [8]Ramsay Scarlett & Co. v. Commissioner,61 T.C. 795 (1974), affd. 521 F.2d 786 (CA4 1975); section 1.165-1(d)(1), Income Tax Regs. The "closed transaction" doctrine applies to theft losses, Ramsay Scarlett & Co. v. Commissioner,61 T.C. at 810-811; sections 1.165-1(d)(3) and 1.165-8(a)(2), Income Tax Regs. Determining whether a loss was sustained in a particular year is an objective inquiry requiring an examination of the facts and circumstances surrounding the loss. Boehm v. Commissioner,326 U.S. 287, 292-293 (1945); Ramsay Scarlett & Co. v. Commissioner,61 T.C. at 812-813. Petitioners have the burden of proving that there was a deductible loss in 1974. Boehm v. Commissioner,326 U.S. at 294. See National Home Products Inc. v. Commissioner,71 T.C. 501, 522 (1979). Petitioners' contentions and the record in the instant case result in a picture of confusion and contradictions. On August 17, 1976, Demetrio told a Federal district court that he had paid $15,000 for supplies and other necessaries for the ship during the preceding 1-1/2 months. At trial in the instant case, petitioners concede that Demetrio paid $7,000, not $15,000. Petitioners do not explain why they made this further investment (whether $7,000 or $15,000) in mid-1976 when they claim that at the end of 1974 there was no reasonable prospect of recovery of the $235,000 they claim to have already invested. On August 17, 1976, Demetrio told the Federal district court that he had paid $235,000 for supplies and other necessaries for the ship during the three-year period beginning "approximately January, 1971". In the instant case, petitioners contend that $95,000 of the same $235,000 had been given to Theocharidis or Couvielos in 1970 ($50,000 on February 6, 1970; $25,000 on March 31, 1970; and $20,000 on July 23, 1970). Apparently, the ship was operating, with a crew, as late as mid-1976. Demetrio took legal proceedings *365 against the ship on August 17, 1976. Petitioners do not explain why they could not have recouped their investment (perhaps as little as $75,000, rather than the $235,000 they now claim) by proceeding against the ship in 1974 or 1975. Demetrio testified that he did not sue Theocharidis because Theocharidis was hospitalized and dying of cancer of the throat. The record does not indicate whether this testimony relates to 1974 or to a later period. In any event, petitioners do not explain why this would cause them to not proceed against Couvielos, or Maritime, or Marina, or the ship itself. Petitioners have satisfied us that they gave a total of $75,000 to Theocharidis and Couvielos in connection with the ship. Petitioners have failed to carry their burden of proving that Evelyn's check to a restaurant was paid in connection with the ship. Petitioners have failed to carry their burden of proving that any part of the $140,000 Demetrio borrowed in July 1971 was paid in connection with the ship. We conclude that petitioners have failed to show that they are entitled to a theft loss deduction for 1974. They have failed to show that, by the end of 1974, there was no reasonable prospect *366 of recovering the $75,000 they have shown they paid (or the $235,000 they claim they paid). Petitioners rely essentially on Dossey's testimony that Theocharidis and Couvielos were "broke" at the end of 1974 to establish that there was no longer any reasonable prospect of recovery. However, no evidence was presented of the facts upon which Dossey based his conclusion, except that certain bank personnel told him that Theocharidis and Couvielos were without funds. Such unsupported opinion is insufficient for petitioners to sustain their burden of proof. Boehm v. Commissioner,326 U.S. at 292-293; Stevens Bros. Foundation, Inc. v. Commissioner,39 T.C. 93, 124-125 (1962), affd. on this issue 324 F.2d 633, 646-647 (CA8 1963). See Holland v. Commissioner,728 F.2d 360, 362 (CA6 1984), affg. a Memorandum Opinion of this Court; [9]Dustin v. Commissioner,53 T.C. 491, 502 (1969), affd. 467 F.2d 47 (CA9 (1972).
Such evidence as there is in the record in the instant cases leads us to conclude that it is more likely than not that, at the end of 1974, petitioners still had a reasonable prospect of recovering their investment. Clearly, petitioners have not met their burden *367 of proving that there was no such reasonable prospect at the end of 1974. Under these circumstances, we do not address the parties' other contentions as to the theft issue, including the question as to whether petitioners have shown that there was a theft under Texas law. We hold for respondent on this issue. B. Worthless Stock, Etc.
Petitioners claim, in the alternative, that their involvement with Theocharidis, Couvielos, the ship, and Marina entitle them to 1974 deductions for worthless stock, a nonbusiness bad debt, or a loss in a transaction entered into for profit. They do not attempt to explain how the record shows that the facts fit into any of these pigeonholes of deductibility. In any event, each of these alternatives requires petitioners to show that, at the end of 1974, there was no reasonable prospect of recovery. Boehm v. Commissioner,326 U.S. at 291-292 (worthless stock); Crown v. Commissioner,77 T.C. 582, 598 (1981) (nonbusiness bad debt); Lewellyn v. Elec. Reduction Co.,275 U.S. 243, 246-247 (1927) (loss from transaction entered into for profit). We have already concluded that petitioners have failed to carry their burden of proof on this essential point. We *368 hold for respondent on this issue. II. Late Filing
Petitioners contend that the late filing of Demetrio's 1974 tax return was due to reasonable cause and not the result of willful neglect. They assert that because of the demands of his medical practice, Demetrio relied exclusively on others to maintain his accounting records and to file his tax returns. With respect to his 1974 tax return, specifically, they assert that he relied on Dossey's father to file it in a timely manner. Respondent maintains that Demetrio had a duty to timely file his tax return, and that his reliance on Dossey's father to file the tax return does not constitute reasonable cause. We agree with respondent. Petitioners have the burden of proving error in respondent's determination that an addition to tax should be imposed under section 6651(a)(1). [10] *369 Moore v. Commissioner,722 F.2d 193, 196 (CA5 1984), affg. a Memorandum Opinion of this Court; [11]Ehrlich v. Commissioner,31 T.C. 536, 540 (1958). This issue is primarily a question of fact to be decided on the basis of all of the surrounding circumstances. Commissioner v. Lane-Wells Co.,321 U.S. 219, 225 (1944); Stevens Bros. Foundation, Inc. v. Commissioner, 324 F.2d at 646. Petitioners must demonstrate both Demetrio's lack of willful neglect and the presence of reasonable cause. Fleming v. United States,648 F.2d 1122, 1124 (CA7 1981); Logan Lumber Co. v. Commissioner,365 F.2d 846, 853 n. 17 (CA5 1966), affg. on this issue a Memorandum Opinion of this *370 Court. [12]
Petitioners' primary contention on this issue is that Demetrio relied on his accountant, Dossey's father, to file his 1974 tax return. However, the record indicates that Dossey's father was not even approached to file the 1974 tax return until about one year after the return's due date. Thus, petitioners have failed to establish the necessary factual precicate to his reliance argument. In addition, reliance on a taxpayer's accountant to timely file an income tax return does not constitute reasonable cause for failure to file that return on time. Logan Lumbe Co. v. Commissioner,365 F.2d at 853-854. Finally, petitioners portray Demetrio as a busy man who devotes little time to matters other than his work as a cardiovascular surgeon. In Logan Lumber Co. v. Commissioner,supra, the Court of Appeals for the Fifth Circuit responded as follows (365 F.2d at 854): The federal tax statute has "placed the responsibility for filing [of a] return on time squarely upon each and every taxpayer." Charles C. Rice, 14 T.C. 503 (1950), at 509. If every taxpayer who forgot to file a return or was too busy to file a return escaped the penalty for failure to file, *371 our tax system would soon collapse. We conclude that Demetrio's failure to file his 1974 income tax return on time was not due to reasonable cause. We hold for respondent on this issue. To reflect the foregoing, Decisions will be entered for respondent.
Footnotes
1. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the year in issue. 2. Petitioner in docket No. 13340-79 concedes that she is liable for an addition to tax under section 6651(a)(1)↩.
3. The parties agree that this $235,000 is the same $235,000 which petitioners claim to be entitled to deduct for 1974. See n. 5, infra. Petitioners claim that the deductible $235,000 consists of (1) the $50,000 paid by Demetrio to Theocharidis on February 6, 1970, (2) the $25,000 Demetrio paid to Theocharidis and Couvielos on March 31, 1970, (3) the $20,000 Evelyn paid to Ten Fathoms West, Inc., on July 23, 1970, and (4) the $140,000 that Demetrio borrowed from a bank in July 1971. 4. We have found, supra,↩ that Demetrio provided only $7,000.
5. On their tax returns, petitioners claimed that the loss was $250,000. At trial, they indicated that the loss might have been as little as $235,000 or as much as $270,000. On brief, petitioners concede that the loss was not more than $235,000. ↩
6. We assume that petitioners each claim one-half the total loss as a result of the operation of the community property laws of Texas.We note that any such deduction would have to be reduced to take into account the $100 limitation provision in section 165(c)(3)↩.
7. Section 165 provides, in pertinent part, as follows: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return. * * * (e) Theft Losses.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. [The subsequent amendment of this provision (by sec. 203 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 422) does not affect the instant case.] 8. T.C. Memo. 1979-479↩.
9. T.C. Memo. 1982-428↩.
10. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; [The subsequent amendment of this provision (by section 318(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 610) does not affect the instant case.] ↩
11. T.C. Memo. 1983-20↩.
12. T.C. Memo. 1964-126↩.